**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-420 (RBW)** |
| **v.** | : | |
| | : | |
| **WILLIAM TRYON,** | : | |
| | : | |
| **Defendant.** | : | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence William Tryon to 30 days imprisonment, at the low end of the agreed upon Sentencing Guidelines range, one year of supervised release, $500 in restitution, and the mandatory $25 special assessment.

I.    **Introduction**

The defendant, William Tryon, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than one million dollars' of property damage.

William Tryon pleaded guilty to one count of violating 18 U.S.C. § 1752(a)(1), Entering and Remaining in a Restricted Building or Grounds, a Class A misdemeanor. While recognizing that the defendant did not personally engage in violence or property destruction, a custodial sentence is nonetheless appropriate in this case. As explained herein, in the course of committing his crime, the defendant (1) initially attempted to gain entry to the Capitol Building, coming face

to face with U.S. Capitol Police ("USCP") officers stationed near the Memorial Doors of the Capitol Building, and his forceful actions were met by resistance from the officers; (2) refused to comply with USCP officers and was pepper-sprayed and hit with a baton by them; (3) entered the Capitol through a door opened by an unidentified man that the defendant had just seen breaking a window, entering the Capitol through that window, before opening the door; and (4) was interviewed by a citizen journalist as he recovered from being pepper-sprayed and beaten with a baton and said he wanted to enter the Capitol to disrupt what Congress was doing.

Before entering or while inside the Capitol on January 6, Tryon disregarded law enforcement officers who were protecting the Capitol, gained entry in an unlawful manner, and remained inside the Capitol for several minutes before he was forced to leave by officers. Once outside the Capitol, Tryon encouraged other rioters and attempted to rally the crowd on the grounds of the Capitol by standing atop a vehicle with a microphone and chanting the lyrics of the song "We're Not Gonna Take It" by rock group, Twisted Sister. He also celebrated the riot by posing for a video (later posted on YouTube) in which he stated: "This is our Capitol Building. All we want to do is enter and tell our representatives that we want our country back. We're not going to take this."  He added, "This was nothing so far. This is our freedom."

The Court must also consider that Tryon's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed to disrupt the Congressional certification vote of the 2020 Presidential election.

## II.  Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 21 (Statement of Offense), at 1-7. As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day.

### *William Tryon's Role in the January 6, 2021 Attack on the Capitol*

On January 6, 2021, William Tryon traveled with friends from upstate New York to Washington, D.C. to attend the "Stop the Steal" rally. According to a post-arrest interview of Tryon by the FBI, he stayed at the rally until the last speech was over before walking to the Capitol.

Tryon admitted he saw smoke and heard booms as he approached the Capitol. As he got closer, he stepped over a green plastic fence that had been torn down. He saw people on the west side of the Capitol Building climbing the scaffolding and ascending the steps. Because he couldn't get close to the doors on the west side, he went to the other side of the Building.  There, he encountered a line of police officers who stood guard and denied him entry.

Photo 1 shows Tryon outside the Capitol at the Memorial Doors being guarded by USCP as he initially tried to enter the Capitol.

Photo 1.



In the post-arrest interview, Tryon stated that he walked around the officers and approached the doors when an officer pepper-sprayed and hit him with a baton.  Tryon recovered from the pepper spray and eventually entered the Capitol after witnessing a rioter break a window, enter the Capitol, and leave open a door for Tryon and other rioters to enter.  Photo 2 shows Tryon inside the Capitol.

Photo 2.



Tryon stated that he heard a gunshot and, undeterred, still tried to enter and remain inside the Capitol Building with the intent of making Congressional representatives listen to him. Tryon also stated that he was doing so because "[w]e lost our country through a corrupt election."

Tryon was inside the Capitol Building for five to eight minutes before being forced out by law enforcement officers. After leaving the Capitol Building, Tryon stated that he stood atop a vehicle on the Capitol grounds with a microphone and tried to "Redress Grievances."  He also tried to rally the crowd by singing the song "We're Not Gonna Take It."  He remained on the Capitol grounds until approximately 4:30 p.m., when law enforcement officers told him and others to leave.

At no time during his post-arrest interview did Tryon express any remorse for his actions. In fact, he justified his actions, stating, "This is our Capitol and knowing that inside there are people who that do not believe in the same principles as our Constitution and they're voting on things . . . the whole thing was powerful." He added, "[i]t was awesome."

As he stood on the steps of the Capitol on January 6, Tryon also described his effort to get into the Capitol to a citizen journalist who posted the videotaped interview on YouTube.[1] Tryon described how he was pepper-sprayed by officers and beaten with a baton to get him to leave the Capitol.  Apparently describing why he was present at the Capitol, Tryon stated: "This is our country. This is our Capitol Building. All we want to do is enter and tell our representatives that we want our country back. We're not going to take this."  He praised his fellow rioters and compared their actions to the storming of Normandy during World War II. Later, he added, "This was nothing so far. This is our freedom."  Photo 3 is a screenshot taken from the YouTube video that shows Tryon on the steps of the Capitol Building.

---

[1] The YouTube video is entitled "Storm The Capitol w/dream floral" and the footage is available at https://youtube.com/watch?v=rJXm-thJwZ8 at 5:22-6:12.

Photo 3.



*The Charges and Plea Agreement*

On March 17, 2021, William Tryon was charged by complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G).  On March 30, 2021, he was arrested at his home in New York.  On June 21, 2021, Tryon was charged in a four-count Information with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G).  On October 18, 2021, he pleaded guilty to Count One of the Information, charging him with a violation of 18 U.S.C. § 1752(a)(1). By plea agreement, Tryon agreed to pay $500 in restitution to the Department of the Treasury.

## III.   Statutory Penalties

The defendant now faces sentencing for Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to one year of imprisonment, a fine of up to $100,000,

and a term of supervised release of not more than one year. The defendant must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).  By plea agreement, the parties have agreed that the riot caused approximately $1.5 million of damage to the United States Capitol and the defendant agreed to pay restitution in the amount of $500. That restitution should be paid to the Architect of the Capitol as indicated in the Presentence Investigation Report ("PSR"). PSR at ¶ 91.

## IV.    The Sentencing Guidelines and Guidelines Analysis

As the offense to which the defendant pled guilty is a Class A misdemeanor, the Sentencing Guidelines are applicable. In cases where the Guidelines are applicable, the sentencing court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation set forth in the PSR. According to the PSR, the U.S. Probation Office calculated Tryon's adjusted offense level under the Sentencing Guidelines as follows:

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2B2.3(a)) | 4 |
| Specific Offense Characteristics (U.S.S.G. §2B2.3(b)(1)(A)(vii)) | 2 |
| Acceptance of Responsibility (USSG §3E1.1(a)) | <u>-2</u> |
| Total Adjusted Offense Level | 4 |

*See* PSR at ¶¶ 29-38.

The U.S. Probation Office calculated Tryon's criminal history as a category I, which is not disputed. PSR at ¶ 41. Accordingly, the U.S. Probation Office calculated Tryon's total adjusted offense level, after acceptance, at 4, and his corresponding Guidelines imprisonment range at 0-6 months. PSR at ¶¶ 38, 84. Tryon's plea agreement contains an agreed-upon Guidelines calculation that mirrors the U.S. Probation Office's calculation.

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita*, 551 U.S. at 349. As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108. Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101. As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing Commission's in-depth research into prior sentences, presentence investigations, probation and parole office statistics, and other data. U.S.S.G. §1A1.1, intro, comment 3. More importantly, the Guidelines reflect Congress's determination of potential punishments, as set forth in statutes, and Congress's on-going approval of Guidelines sentencing, through oversight of the Guidelines revision process. See 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to the Guidelines). Because the Guidelines reflect the collected wisdom of various institutions, they deserve careful consideration in each case. Because they have been produced at Congress's direction, they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005). "[W]here judge and Commission *both* determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)," and that *significantly* increases the likelihood that the sentence is a reasonable one." *Rita*, 551 U.S. at 347 (emphasis in original). In other words, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance all of the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines will be a powerful driver of consistency and fairness moving forward.

## V.     Sentencing Factors Under 18 U.S.C. § 3553(a)

The Court should next consider all of the applicable factors set forth in 18 U.S.C. § 3553(a). *Gall*, 552 U.S. at 49-50. Under § 3553(a), "[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a).

Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar

conduct. § 3553(a)(6). In this case, as described below, all of the Section 3553(a) factors weigh in favor of incarceration.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history and defies comparison to other mass criminal events. It represented a grave threat to our democratic norms. Indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants.

While each defendant should be sentenced based on their individual conduct, this Court should note that each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances. As they entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting between the rioters and law enforcement officials and smelled chemical irritants in the air. No rioter was a mere tourist that day.

Additionally, this Court should assess Tryon's individual conduct in the light of the spectrum of the rioters' conduct on January 6. This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant

demonstrated sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

To be clear, had the defendant personally engaged in violence or destruction, he would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on the part of the defendant is therefore not a mitigating factor in this misdemeanor case.

Tryon's presence on the grounds of the United States Capitol, as well as his attempted entry and subsequent entry into the Capitol Building raise significant concerns. As Tryon approached the Capitol's grounds, he saw rising smoke and heard booms. He crossed over torn down fencing and saw rioters on the west side of the Capitol climbing scaffolding and ascending the steps to the building. Because he couldn't get as close as he wanted to gain entry to the Capitol Building, he went to the east side of the building where there were fewer rioters. Tryon and other rioters approached the Memorial Doors that were being guarded by law enforcement officers. One of them sprayed him with pepper-spray and he was hit with a baton when he forcefully attempted to gain entry into the Capitol. He clearly knew that he did not have permission to enter the Capitol, but did so anyway.

Tryon is one of a much smaller group of rioters because he was expressly told by law enforcement officers that he could not enter the Capitol Building. He stood at the front of a mob that faced off with law enforcement officers at the entry to the Capitol. Tryon intentionally disregarded the officers because his intent to either interfere with or disrupt the Congressional proceedings was greater than compliance with the instructions given to him by the officers.

Moreover, the actual manner in which he entered the Capitol made clear that his entry was unlawful. After being denied entry to the Capitol by officers, Tryon observed a fellow rioter break

a window and remove the glass, enter the Capitol through that opening, and then observe that same rioter open and leave open a door.   Unlike the Memorial Doors, the newly opened door was unguarded and enabled Tryon the access that he wanted and used to gain entry into the Capitol. He was inside the Capitol for five to eight minutes before he and others were forced out.

Tryon's incendiary language after he was forced to leave the Capitol and remained on the Capitol's grounds is also an aggravating factor. As he stood on the steps of the Capitol and engaged in a videotaped interview, Tryon justified his presence stating, "*This is our country. This is our Capitol Building. All we want to do is enter and tell our representatives that we want our country back. We're not going to take this.*"   Later, he suggested there would be more of the same actions to come, adding "*This was nothing so far. This is our freedom.*"   Additionally, as Tryon stated in his post-arrest interview, he got atop a vehicle with a microphone and attempted to rile up fellow rioters.

To be clear: political speech – even aggressive and uncomfortable political speech – is protected speech in the United States, and rightly so. But that does not excuse the defendant's criminal conduct.

Not until his presentence interview did Tryon express any remorse for his criminal conduct. *See* PSR at ¶ 28.   The statements to the author of the PSR marked a sharp departure from his statements when he was interviewed on January 6 and, later, when he engaged in the post-arrest interview with the FBI and became emotionally defiant in justifying his actions. During that post-arrest interview, Tryon was proud of what he had done and it is only when the consequences of his actions have caught up to him that he is showing any regret. But, there have to be consequences, rather than a mere slap on the wrist.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

**B.      The History and Characteristics of the Defendant**

As set forth in the PSR, Tryon is a 71-year-old man who was born in Albany, New York. PSR at ¶ 47. He has lived in the Albany area of New York his entire life.  He graduated from high school and attended one year of college. He left college to start an excavating business. PSR at ¶ 64.

He and his wife own a 180–acre farm, known as Cedar Grove Farm, in New York. They generate income from the farm by raising cattle, logging, selling firewood and hay, farming, and operating greenhouses. PSR at ¶ 65.

Tryon has a very limited criminal history. In 1967, at the age of 16, Tryon was convicted of grand larceny involving a vehicle. He was sentenced to 30 days in jail and two years' probation. PSR at ¶ 40.

**C.      The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[2] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr.

---

[2] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually – should be expected") (statement of Judge Hogan).

### D.     The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. Many who participated in the riot intended to delay or even prevent one of the most important democratic processes we have: the peaceful transfer of Presidential power.  As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our

15

grandchildren that democracy stands as the immutable foundation of this nation." *Id.* At 70; *see United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 24-25 ("What happened on that day was nothing less than the attempt of a violent mob to prevent the orderly and peaceful certification of an election as part of the transition of power from one administration to the next, something that has happened with regularity over the history of this country. That mob was trying to overthrow the government. . . . [and those who committed] violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan).

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Tryon's words to fellow rioters and in an interview on January 6, as well as his post-arrest interview with the FBI, demonstrate the need for specific deterrence for this defendant. It is bad enough that he entered the Capitol despite first being denied entry by law enforcement officers, being pepper-sprayed and hit with a baton, and that he saw the violence and destruction caused by others around him at the Capitol. It is also bad enough that he joined the mob that was overwhelming law enforcement officials. But, following his entry into the Capitol, he displayed pride in what he and other rioters had done and encouraged the continuation of disruptive conduct to interrupt the peaceful transfer of power. He demonstrated no recognition of wrongdoing. After he was forced to leave the Capitol, Tryon sat on the steps of the Capitol and proclaimed that what

had taken place that day "was nothing so far." His words and intentions had the potential to spread harm much further than his actions that day, and they warrant specific deterrence in and of themselves.

### E.     The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress.[3] Each offender must be sentenced based on their individual circumstances, but with the entirety of the backdrop of the January 6 riot in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes. A probationary sentence should not become the default.[4] "I don't want to create the impression that probation is the automatic outcome here because it's not going to be."  *United States v. Anna*

---

[3] Attached to this Sentencing Memorandum is an Exhibit containing tables providing additional information about the sentences imposed on other Capitol breach defendants.  The tables also show that the requested sentence here would not result in unwarranted sentencing disparities.

[4] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation, including in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); and *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

*Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19 (statement of Judge Lamberth); *see also United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 (similar).

The government and the sentencing courts have already begun to make meaningful distinctions between offenders. Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment. Those who trespassed, but engaged in aggravating factors, merit serious consideration of institutional incarceration. While those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home detention.

After a review of the applicable Section 3553(a) factors, the government believes that Tryon should be sentenced to one month of incarceration for his role in the Capitol riot, during which he (1) defied direct law enforcement officers' commands; (2) persisted in entering into the Capitol by availing himself of an opportunity created by a fellow rioter who the defendant witnessed break a window, remove the glass, enter the Capitol, then open an adjacent door so the defendant and others could enter; and (3) proclaiming his intent to interfere in the certification of the election and justifying the riot, including the statements "We're Not Gonna Take It" and "this was nothing so far."

The defendant's threatening statements made on January 6 contributed to the environment of terror on that day. On March 30, 2021, when he engaged in a post-arrest interview with the FBI, he demonstrated the same passion and justification that he did on January 6. Other than the statement Tryon made to the presentence reporter, expressing remorse, the government is unaware of any reason that is sufficiently mitigating the sentence that the government is recommending of one month imprisonment.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095.

Although hundreds of individuals participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long he remained inside, the nature of any statements he made (on social media or otherwise), whether he destroyed evidence of his participation in the breach, etc.—help explain the differing recommendations and sentences. And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement. *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Moreover, assessing disparities, and whether they are unwarranted, requires a sufficient pool of comparators. As the number of sentences in the Capitol breach misdemeanor cases increase

and the pool of comparators grows, the effect on sentences of obviously aggravating considerations should become more apparent.

　　While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the Court may also consider the sentence imposed in *United States v. Derek Jancart and Erik Rau*, 21-cr-00148 (JEB) for reference.　Jancart and Rau received sentences of 45 days of incarceration.　They observed significant violence as they approached the Capitol building and laughed and cheered upon seeing it.　Like Tryon, who immediately entered the Capitol after a fellow rioter broke a window and opened a door for other rioters to enter, Jancart and Rau entered through the Capitol exactly five minutes after it was breached.

　　Additionally, in *United States v. Jennifer Leigh Ryan*, 21-Cr-00050 (CRC), the Court imposed a sentence of 60 days of incarceration where Ryan entered the Capitol despite seeing significant violence outside and provided several interviews to different news outlets minimizing the events of January 6.　Like Ryan, Tryon celebrated his actions and those of others on January 6 while he stood on the Capitol steps and in his post-arrest interview. Thus, a sentence in line with the Government's recommendation would not be disparate to other sentences being imposed for similar conduct.

## VI.    Conclusion

For all of the reasons set forth above, the government recommends that a sentence of 30 days incarceration, at the low end of the agreed-upon Guidelines range, one year of supervised release, 60 hours of community service, $500 restitution, and the mandatory $25 special assessment, would be "sufficient but not greater than necessary" to accomplish the goals of 18 U.S.C. § 3553(a)(3).

Respectfully submitted,

MATTHEW GRAVES
UNITED STATES ATTORNEY
DC BAR NO. 481052

By:    _____
ANITA EVE
PA Bar No. 45519
Assistant United States Attorney (Detailee)

U.S. Attorney's Office
555 4th Street, N.W., Room 5840
Washington, D.C.  20530
Anita.eve@usdoj.gov
(215) 764-2177